IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARGARET "PEG" RYBAS, *et al.*,

    *Plaintiffs*,

v.

RIVERVIEW HOTEL
CORPORATION, *et al.*,

    *Defendants*.

Civil Action No. ELH-12-03103

**MEMORANDUM OPINION**

A joyful occasion did not end happily for plaintiffs Margaret "Peg" Rybas and her husband, Edward Balajewski, who were guests at a wedding held in Oxford, Maryland on October 4, 2010. While they were dancing on a portable dance floor, Ms. Rybas fell and sustained severe injuries. At the time of the wedding, Ms. Rybas was 75 years of age and her husband was 85 years old.

Plaintiffs subsequently filed suit against Riverview Hotel Corporation t/a Sandaway Bed & Breakfast ("Sandaway"), the venue for the wedding, and the caterer, PeachBlossoms, Inc. ("PeachBlossoms"), asserting causes of action for negligence and loss of consortium. *See* Complaint (ECF 1).[1] According to plaintiffs, despite rainy weather before and during the wedding, defendants allowed guests to use the dance floor, but failed to take adequate safety precautions and failed to warn the guests of danger due to slippery conditions.

In the Complaint, plaintiffs allege that, "as a result of the fall," Ms. Rybas fractured "the distal radius of the left wrist extending into the joint space with an associated fracture of the

---

[1] Jurisdiction is based on diversity of citizenship. Defendants have each filed cross-claims. *See* ECF 12, 13.

ulner styllid," and "also had a fracture of the distal radius extending into the joint space and an associated fracture of the ulner styllid of [her] right wrist." *Id.* ¶¶ 13-14.  Several days after the fall, Ms. Rybas was also diagnosed with a lumbar compression fracture.  *Id.* ¶ 15.  Further, plaintiffs allege that Ms. Rybas underwent surgery on October 14, 2010, spent three nights in the hospital, and "required extensive rehabilitation" thereafter.  *Id.* ¶ 16.

Defendants filed post-discovery motions for summary judgment, each supported by numerous exhibits.  *See* Sandaway's motion (ECF 47, "S. Mot.") and supporting memorandum (ECF 47-1, "S. Mem."); PeachBlossoms' motion (ECF 50, "P. Mot.") and supporting memorandum (ECF 50-1, "P. Mem.").  Plaintiffs have filed a consolidated response in opposition to both motions (ECF 55, "Opposition" or "Opp."), with exhibits, and each defendant has filed a reply (ECF 56, by PeachBlossoms, "P. Reply"; and ECF 57, by Sandaway, "S. Reply"), along with additional exhibits.[2]

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I will deny both motions.

## I. Background[3]

On Monday, October 4, 2010, plaintiffs attended the wedding of Ms. Rybas's niece, held at the Sandaway Bed & Breakfast in Oxford, Maryland.  *See* P. Mem. Exh. 18 (ECF 50-20);

---

[2] In general, defendants present similar arguments in their summary judgment motions. *See infra.* And, each defendant has adopted arguments raised by the other.  *See* S. Reply at 1 n.1 ("Sandaway adopts all appropriate arguments in support of summary judgment made by" PeachBlossoms); ECF 58 (PeachBlossoms joins Riverview's reply).

I also note that, in a number of instances, the parties have submitted the same exhibits, including excerpts from the same depositions, but with different exhibit numbers.  The citations used in this Memorandum Opinion reflect those instances in which a given exhibit has been attached to multiple briefs.

[3] The facts have been construed in the light most favorable to plaintiffs.

Opp. Exh. 1 (ECF 55-1) (the "Mills Report") at 6; Deposition of Laura A. Dennis, May 13, 2013, S. Mem. Exh. 3 (ECF 47-4), P. Mem. Exh. 1 (ECF 50-3), Opp. Exh. 4 (ECF 55-4), S. Reply Exh. 4 (ECF 57-4) ("L. Dennis Dep.") at 112.   Sandaway is owned by Wendy and Kenneth ("Ken") Gibson.   The bride and groom hired PeachBlossoms, run by Laura ("Laurie") Dennis and Gregory Dennis, as the caterer for their wedding.   *See* L. Dennis Dep. at 22-23; P. Mem. Exh. 7, Affidavit of Laura Dennis ("L. Dennis Aff.") ¶ 1 (stating she is Vice President of PeachBlossoms); P. Mem. Exh. 8, Affidavit of Gregory Dennis ("G. Dennis Aff.") ¶ 1 (stating he is President of PeachBlossoms).   The wedding itself was held adjacent to a beach, on the lower of two terraces located between the Sandaway Bed & Breakfast and the beach.   Mills Report at 22.   Approximately 90 feet of grass separated the Bed & Breakfast and the tent in which the wedding dinner was held.   *Id.* at 23.

PeachBlossoms provided the tent, which was erected by Mr. Dennis and an assistant on Saturday, October 2, 2010.   L. Dennis Dep. at 25, 30-32.   On the same date, inside the tent, PeachBlossoms assembled a portable dance floor, which it owned.   Mills Report at 6; Opp. Exh. 3 (ECF 55-3, PeachBlossoms answers to plaintiff Rybas's interrogatories) at 15; L. Dennis Dep. at 33, 80.   The dance floor measured 15 feet by 16 feet.   *See* G. Dennis Dep. at 10-11.   The owner's manual for the dance floor stated:   "ALL FLOORS are slippery when wet, especially vinyl floors.   Customers should be aware of this fact."   *See* Opp. Exh. 2 (ECF 55-2) at 8 (owner's manual).

It did not rain on October 2, when the floor and tent were installed.   Mills Report at 17; Deposition of Gregory H. Dennis, May 13, 2013, S. Mem. Exh. 5 (ECF 47-6), P. Mem. Exh. 2 (ECF 50-4) ("G. Dennis Dep.") at 23.   The record contains inconsistent information as to

whether it rained on October 3, the day before the wedding.  Measurements taken a quarter of a mile from the Sandaway Bed & Breakfast indicate that it did not rain on October 3.  Mills Report at 17.  Similarly, measurements taken 20 miles away at the Easton Airport reflect no precipitation on October 3.  *Id.*  However, Laurie Dennis testified that on "Sunday"—apparently a reference to October 3—"it was wet" and "raining very hard," which made the ground "muddy and wet."  L. Dennis Dep. at 94-95.

According to PeachBlossoms' interrogatory responses, it had "recommended moving the location of the wedding to higher ground due to the anticipated adverse weather."  Opp. Exh. 3 at 15.[4]  However, "the wedding couple insisted that the tent and dance floor be installed at the originally agreed upon location," and "Sandaway also did not want anything moved because it would block the view of the water for its guests."  *Id.*

It is uncontested that it rained on October 4, 2010, the day of the wedding.  And, it appears to have rained both in the early morning hours and again later in the day, including during the wedding reception.  By one measurement, taken a quarter of a mile from the Sandaway Bed & Breakfast, rainfall on October 4 totaled 0.7 inches.  Mills Report at 17.  And, measurements taken at the Easton Airport reflect a total rainfall of 0.58 inches.  *Id.*  Regarding the latter measurement, the Mills Report states, *id.*: "Hourly precipitation was recorded at the Easton Airport station where rain accumulation ranged between 0.01 inches and 0.08 inches until approximately 9am.  Total accumulated rainfall recorded at the Easton Airport was 0.58 inches on October 4, 2010."  Witness testimony indicates that heavy rain fell in the evening, near the start of dinner.  *See, e.g.*, Deposition of Maurice Shea, Dec. 16, 2013, Opp. Exh. 7 (ECF 55-7),

---

[4] It is unclear from this exhibit whether safety concerns or other issues motivated PeachBlossoms' recommendation.

P. Reply Exh. 1 (ECF 56-1), S. Reply Exh. 3 (ECF 57-3) ("Shea Dep.") at 22-23.  For her part, Ms. Rybas described the weather on October 4 as "cool and rainy," with "[o]n and off rain." Deposition of Margaret Rybas, May 9, 2013, S. Mem. Exh. 1 (ECF 47-2), P. Mem. Exh. 5 (ECF 50-7), Opp. Exh. 8 (ECF 55-8), S. Reply Exh. 1 (ECF 57-1) ("Rybas Dep.") at 20-21.

The owners of Sandaway, Wendy and Ken Gibson, both testified that, on the day of the wedding, the grass was wet.  Deposition of Wendy Lou Gibson, Nov. 26, 2013, S. Mem. Exh. 12 (ECF 47-13), P. Mem. Exh. 11 (ECF 50-13), Opp. Exh. 5 (ECF 55-5) ("W. Gibson Dep.") at 42; Deposition of Kenneth Heisey Gibson, Nov. 26, 2013, Opp. Exh. 6 (ECF 55-6) ("K. Gibson Dep.") at 51.  Wendy Gibson also testified that she saw no signs that either warned guests of slipperiness or indicated that they would need to cross wet grass.  W. Gibson Dep. at 43-44. And, when Ms. Dennis of PeachBlossoms was asked whether her employees had told "anybody that it was wet or muddy or anything like that the day of the wedding," she acknowledged that they had not.  L. Dennis Dep. at 97.  More generally, neither Sandaway nor PeachBlossoms provided any warnings to the guests that conditions on the dance floor might be wet and slippery. *See* W. Gibson Dep. at 43-44; L. Dennis Dep. at 95-97.

According to an event schedule, the wedding reception was to begin with an open bar under the tent, lasting from 5:15 until 6:30 p.m.  P. Mem. Exh. 3 (ECF 50-5).  Between 6:30 and 7:15 p.m., salad was to be served; several dances, including a traditional bride-groom dance, were to occur; and the dance floor was to be opened.  *Id.*  The main dinner service was scheduled to begin at 7:15 p.m.  *Id.*

After the wedding ceremony, Ms. Rybas walked across the grass, which she described as wet and muddy, to get to her dinner table inside the tent.  Rybas Dep. at 32.  Prior to beginning

dancing, Ms. Rybas also walked from her dinner table to the Sandaway Bed & Breakfast, across a muddy area, in order to use the restroom inside. *Id.* at 34. Ms. Rybas recalled that on the way back to her dinner table, she wiped her shoes on the grass in order to clean them. *Id.* at 35.

Heavy rain began around the start of dinner. Shea Dep. at 22-23. Dancing did not begin until after the dinner portion of the evening was over and the wedding cake had been cut. Rybas Dep. at 35; Deposition of Edward Balajewski, May 9, 2013, S. Mem. Exh. 7 (ECF 47-8), P. Mem. Exh. 13 (ECF 50-15), Opp. Exh. 11 (ECF 55-11) ("Balajewski Dep.") at 12. Both plaintiffs stated that they had completed their dinners before beginning to dance. Rybas Dep. at 34-35; Balajewski Dep. at 12-13. The dancing started with a traditional bride-groom dance, and plaintiffs joined approximately five minutes later. Rybas Dep. at 35-36. Ms. Rybas recalled that the dance floor was slightly elevated, approximately three inches higher than the surrounding ground. Rybas Dep. at 36-37. Regarding her fall, Ms. Rybas testified, *id.* at 37-39:

> Q      Okay. How long had you been on the dance floor prior to your fall?
>
> A      Ten minutes.
>
> Q      And had you been dancing the whole time?
>
> A      Yes.
>
> Q      Had you been dancing with [Mr. Balajewski] the whole time?
>
> A      Yes.
>
> Q      Tell me what happened when you fell.
>
> A      Well, we were doing a jitterbug, and I was making a turn, and I turned, and my foot slipped, and all of a sudden, I came to a halt, sudden halt and my heel just stopped.
>
> Q      Okay.

A       Something made me just stop and halt, and I flew back in the air and landed on the ground.

* * *

Q       Did you ever see what it was that caused you to fall?

A       No.

Q       To this day, do you know what it is that caused you to fall?

A       Not exactly.

Q       What does that mean?

A       Well, my foot slipped and hit something.  But my nephew was -- when I was lying on the ground, he was trying to comfort me, and he said, well -- he said I could see where maybe your heel caught on the edge.  That's what he told me. But all I remember is my foot slipped out from under me, and it just jammed to a dead halt, and I flew backwards.

An ambulance was summoned, arriving approximately a half-hour after Ms. Rybas had fallen.  Rybas Dep. at 42.  According to a document titled "EMAIS Patient Care Report," an emergency call was placed at 8:16 p.m., with responders arriving at 8:25.  *See* Opp. Exh. 6 (ECF 50-6).  In other words, it appears that Ms. Rybas's fall occurred shortly before 8:00 p.m.  According to medical records, Ms. Rybas told medical personnel that "WHILE DANCING . . . SHE FELL BACKWARD, TRIED TO BREAK HER FALL W/ BOTH ARMS" and also stated: "'I JUST TRIPPED ON THE HEEL OF MY SHOE & FELL BACKWARD.'"  P. Mem. Exh. 6 (ECF 50-8) at 1, 12.

Regarding the circumstances surrounding Ms. Rybas's fall, the parties largely rely on deposition testimony from a number of witnesses.  To begin, testimony from Ms. Rybas's husband, Mr. Balajewski, who was dancing with her at the time of the fall, is relevant:

Q       Did you see anything that caused [Ms. Rybas] to fall?

A      No.

Q      So you don't know what made her actually go down?

A      No.

Q      You didn't see a wet spot on the dance floor?

A      No.

Q      You didn't see any mud?

A      No.

Q      You didn't see anything that she might have caught her foot or shoe on?

A      No.

Balajewski Dep. at 17-18.

Mr. Balajewski was first made aware of the possibility that mud, grass, or moisture on the dance floor could have caused Ms. Rybas's fall at around the time the ambulance arrived, approximately 30 minutes after the incident.  *See* Balajewski Dep. at 37-40; Rybas Dep. at 42. In particular, he testified that he "just took a glance and spotted something, and that was it . . . . I saw something that was slippery there, yes . . . . It looked to me like there was pieces of grass and a little bit of dirt with it."  Balajewski Dep. at 38-39.  However, Mr. Balajewski conceded that he could not say that the grass he saw had caused his wife to fall.  *Id.* at 41.

Ellen Kobler, another relative who was present at the wedding, testified as follows with respect to the incident involving Ms. Rybas:

Q      Did anyone, Mrs. Rybas or anybody else, tell you what caused Mrs. Rybas to fall?

A      No.  No one seemed to know.

* * *

Q       Have you ever to this day had anybody tell you why Ms. Rybas fell?

A       I have had people sort of guess, but nobody has known for sure.

Q       Who has guessed?

A       I don't remember.

Q       Okay.  And what have the guesses been, if you remember?

A       Tripped on something.  I don't know.  It really was people without --

Q       Knowledge?

A       -- any knowledge or evidence saying, oh, maybe it was this or maybe it was that.  Nobody has told me why she fell with any credibility.

Deposition of Ellen Langan Kobler, Dec. 17, 2013, S. Mem. Exh. 8 (ECF 47-9), P. Mem. Exh. 14 (ECF 50-16), S. Reply Exh. 5 (ECF 57-5) ("Kobler Dep.") at 19, 24-25.

Catherine Mateer, a niece of Ms. Rybas and a sister of the bride, testified: "I know people said what happened, and the answer was she fell. We were more concerned with how she was than how she got there."  Deposition of Catherine A. Mateer, Dec. 17, 2013, S. Mem. Exh. 9 (ECF 47-11), P. Mem. Exh. 12 (ECF 50-14), S. Reply Exh. 6 (ECF 57-6) ("Mateer Dep.") at 17. Ms. Mateer also stated that she observed Ms. Rybas dancing prior to the fall, *id.* at 21:

A       She was doing the twist. Aunt Peggy has done ballroom dancing as her form of exercise for as long as I can remember. She was showing off her moves and strutting her stuff.

Q       And when you say showing off her moves and strutting her stuff, can you describe some of those moves for me?

A       She was spinning, she was twisting. She and Ed would show off dance steps. They were -- none of her nieces and nephews are very good dancers, and she was showing us moves that even we could do.

Q     Would you describe her dancing as vigorous?

A     Yes.

Regarding the state of the dance floor near the time of Ms. Rybas's fall, plaintiffs rely heavily on testimony from Ms. Rybas's brother, Maurice ("Mike") Shea.  Although Mr. Shea had seen Ms. Rybas dancing, he did not see her fall, nor did he know how long she had been dancing before she fell.  As Mr. Shea testified, he had been "up in the restrooms when she fell." Shea Dep. at 23-24.

With respect to the conditions, Mr. Shea testified that rain started to fall, "pretty hard," around the time dinner began.  Shea Dep. at 22-23.  Because rain was "blowing up underneath the plastic" of the tent, the sides of the tent were brought down, and a heater was turned on.  *Id.* Regarding the dance floor in particular, Mr. Shea testified:

Q     Okay.  Did you at any time observe any wetness or mud or debris of any kind on the dance floor?

A     Yes, because like I said, it started -- the wind was blowing up under the -- the tarps they had down.  And the dance floor was close --

Q     What tarps, the sides you mean --

A     Yes.

Q     -- of the tent?

A     The plastic.

Q     Yeah.

A     It was blowing up underneath the plastic, so they had to tie that down.  In the meantime, the floor got wet because of people walking in and out, track [sic] mud and the water onto the floor.

Shea Dep. at 24.

Further, Mr. Shea testified, *id.* at 45:

Q       Did anyone complain about the dance floor being slippery?

A       Yeah, people were saying they were -- it -- it looked wet.

Q       Well, you said "people were saying it looked wet."  Can you tell us anyone that may have said that?

A       Not that I rem- -- not -- not specifically, no.

Q       Okay.  Do you remember if that was before or after your sister fell?

A       Before.

Q       When you saw your sister, you didn't see her fall, so you came upon her; is that correct?

A       Yes.

Q       Did you look at the dance floor in relation to where [Ms. Rybas] was when she was on the floor?

A       Yes.

Q       And at that point in the immediate -- the closest part of the dance floor to [Ms. Rybas], did you see any -- anything on the dance floor, any foreign material on the dance floor?

A       Mud, rain and mud, a little grass.

Q       You specifically saw rain and mud in an area where she -- closest to her on the dance floor when you went to her?

A       Yeah, well, the door leading into the dance was all muddy from the -- from the rain.

Concerning the cause of Ms. Rybas's fall, Mr. Shea testified, *id.* at 29-31:

Q       [D]id you have any conversations with Ms. Rybas at the hospital?

A       Yeah.  After we were allowed to see her.

Q       Okay.  What did she tell you?

- 11 -

A       Well.  She said she fell and she said she tried to break her fall.

Q       So she just told you she tried to break --

A       Yeah.

Q       -- her fall by putting the hands down?

A       Yeah.  In the back of her.

Q       Did she tell you about anything -- what -- what she thought made her fall?

A       Not at that time.

Q       Okay. Did you ever learn from Ms. Rybas or Mr. Balajewski or for that matter anybody else about what caused Ms. Rybas to fall?

A       No.  What was that again?

Q       I'll try again. Did anybody else, whether it was Ms. Rybas, Mr. Balajewski or anybody else, tell you what caused Ms. Rybas to fall on October 4, 2010?

A       No.  Well, she said she just went off the dance floor with -- the dance floor had kind of a dropoff to it.

Q       Ms. Rybas said she went off the dance floor?

A       Yeah, her heel caught or something like that.

Plaintiffs also point to deposition testimony and statements by other individuals that, in their view, support the claim that Ms. Rybas slipped and fell due to a wet dance floor.  To that end, plaintiffs note that Ms. Rybas, when asked whether she had seen anyone else slip and fall, said she saw the mother of the bride "slip and fall while she was on the dance floor," prior to Ms. Rybas's own fall.  Rybas Dep. at 100.  Plaintiffs also rely on the deposition testimony of Laurie Dennis of PeachBlossoms:

Q      And if they said the dance floor is slippery, you would agree with them as well, correct?

* * *

A      At the end of the evening after those people had been drinking and dancing for seven hours, the dance floor was probably a mess.

Q      And you would agree that at some point it was probably slippery that day?

A      I'd say by 10:00, 11:00, 12:00 o'clock the dance floor was probably a mess.

Q      And when you say, "a mess," you mean slippery, right?

A      I mean it probably had grass walked onto it.

Q      Probably had moisture as well, right?

A      Moisture doesn't necessarily make the dance floor slippery, but I would say it probably – it's hard to know.  We were heating the tent in such a way that people had to take their jackets off. . . .  Heat dries things off very quickly.

L. Dennis Dep. at 56-57.

There is no evidence that defendants inspected the dance floor before or during the wedding reception to ensure the safety of the guests.  According to Laurie Dennis, "[e]veryone on the staff" kept "an eye on the dance floor."  L. Dennis Dep. at 53; *see also id.* at 51 ("We keep an eye on the dance floor . . . as a team.").  Nevertheless, Ms. Dennis also acknowledged that PeachBlossoms does not "have someone assigned to lifeguard the dance floor," in the sense that they do not "have anyone stopping people from dancing the way they want to dance."  *Id.* at 50-51.

According to PeachBlossoms, no one complained to their employees regarding the presence of water, moisture, mud, or grass on the dance floor prior to Ms. Rybas's fall, nor did anyone complain of slippery conditions or any problems or defects.  *See* L. Dennis Aff.; G.

- 13 -

Dennis Aff.; P. Mem. Exh. 9, Affidavit of Allison Dungan ("A. Dungan Aff."); P. Mem. Exh. 10, Affidavit of Susan Galanek ("S. Galanek Aff."). Further, no one complained to PeachBlossoms *after* Ms. Rybas's fall regarding the presence of water, moisture, mud, or grass on the dance floor, nor did anyone complain of slippery conditions or any problems or defects during that time. *See* L. Dennis Aff.; G. Dennis Aff.

In an email to Laurie Dennis dated February 17, 2013—more than two years after Ms. Rybas's fall—Susan Galanek indicated that she had worked for PeachBlossoms on the night of the incident and recalled that an "older woman" had fallen. Ms. Galanek stated, in part: "I know the dance floor was slippery because the ground was saturated, and when people got on the dance floor, their feet were wet." P. Mem. Exh. 16; Opp. Exh. 10 at 1. She added: "Unfortunately, all of the weddings we have done blend together and I am not really clear about what details are from which event." *Id.* In a separate email to Laurie Dennis, also dated February 17, 2013, Allison Dungan confirmed that she had worked for PeachBlossoms during the incident, and stated: "The big thing that I remember about that event is that the ground was soft with people going to and from the B and B and walking on the wet grass – things were slippery." P. Mem. Exh. 16; Opp. Exh. 10 at 2.[5]

---

[5] PeachBlossoms challenges those emails as inadmissible hearsay, "if offered to prove the truth of the statements asserted therein." P. Mem. at 18. PeachBlossoms acknowledges that Galanek and Dungan served as "part-time employees of PeachBlossoms." P. Mem. at 17. Under Federal Rule of Evidence 801(d)(2), which plaintiffs invoke, a statement is not hearsay when offered against an opposing party and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). However, based on the content of the emails from Galanek and Dungan, in which they provide current addresses, it appears they were not active PeachBlossoms employees at the time of their statements. As such, it is not obvious that those statements meet the requirements of Fed. R. Evid. 801(d)(2)(D). At this stage, it is not apparent what other exceptions or non-hearsay uses of those statements might allow a fact-finder to consider those communications. Given this uncertainty, I will not

The parties have also submitted a number of photographs in support of their respective contentions.   Plaintiffs point to a photograph of Ms. Rybas's shoe, taken after the fall. According to plaintiffs, it "clearly shows that the heel was streaked with mud and debris."  Opp. at 13 (citing Opp. Exh. 9, ECF 55-9).  However, according to PeachBlossoms, photographs taken of the dance floor, some of which depict Ms. Rybas dancing, "reveal a clean, dry dance floor." P. Mem. at 20 (citing P. Mem. Exh. 15, ECF 50-17); *see also* S. Mem. Exh. 6 (ECF 47-7); *id.* Exh. 11 (ECF 47-12); S. Reply Exh. 2 (ECF 57-2).

Sandaway's expert witness, Brian L. Mills, P.E., a mechanical engineer, prepared a report dated October 30, 2013.  *See* Mills Report.  He stated, in part, *id.* at 24-25:

> PeachBlossoms, Inc. had the duty, responsibility, and knowledge to properly maintain the dance floor in a manner that would ensure a dry dance floor and the safety of the guests. . . .   PeachBlossoms, Inc. was aware that the dance floor would become slippery when wet as described in the instructions manual for the vinyl tile portable dance floor.   PeachBlossoms, Inc. was aware of the inclement weather and rain on Monday, October 4, 2010, and PeachBlossoms, Inc. was aware that guests would traverse the wet grassy areas when traveling between the tent and Sandaway Bed & Breakfast.  Since PeachBlossoms, Inc. was aware that spilled drinks on the dance floor presented an unsafe condition and staff members were instructed to take appropriate steps to maintain a dry dance floor, PeachBlossoms, Inc. should have taken appropriate steps to ensure that guests d[id] not convey water from the grassy area onto the dance floor in order to maintain the slip resistant surface.  This was a condition that PeachBlossoms, Inc. was aware of as evident through the testimony reviewed and could have been mitigated through periodic inspections, signage and instructions to users of the dance floor.

> PeachBlossoms, Inc. did not take steps to mitigate water conveyance from the grassy area to the dance floor.  One potential solution would have been to employ walkway mats that absorb water from guests' shoes and collect grass debris when entering the tented area.  At a minimum, PeachBlossoms, Inc. had

---

consider the statements of Ms. Galanek or Ms. Dungan in addressing defendants' summary judgment motions.  Nevertheless, I make no determination here that would necessarily preclude Ms. Galanek and Ms. Dungan from testifying as fact witnesses at trial.

the responsibility to warn and instruct guests through signage that the dance floor may be slippery when wet.

Further, the Mills Report stated, *id.* at 28:

> It was reasonable to expect the dance floor to be wet due to moisture conveyance from the precipitation on the grassy areas between the tent and the Sandaway Bed & Breakfast[.] Peachbossoms, Inc. had the knowledge, duty, and responsibility to ensure the safety of the guests by providing appropriate measures to minimize moisture conveyance and instructing guests with appropriate signage. It is also likely that Mrs. Rybas did not experience a slip event but misstepped off the edge of the dance floor and fell backward to the adjacent grassy area.

Mr. Mills opined: "There is no testimony to support that Mrs. Rybas experienced a slip event while dancing on the portable dance floor." Mills Report at 26. Rather, he stated: "When considering Mrs. Rybas'[s] and Mr. Balajewski's testimony of the fall event, it is more likely and plausible that Mrs. Rybas experienced a misstep." *Id.* at 27.

Although the record does not contain a report from plaintiffs' expert, Dr. Gregory Harrison, his deposition testimony indicates that he concluded that the dance floor "must have been very slippery and wet" in the location where Ms. Rybas slipped. Deposition of Gregory A. Harrison, Ph.D., P.E., Dec. 19, 2013, Opp. Exh. 12 (ECF 55-12) ("Harrison Dep.") at 65. As Dr. Harrison explained, "when you dance, slipping and falling is not the norm. Just as walking and falling is not the norm." Harrison Dep. at 65. Dr. Harrison reached that conclusion, he said, based on the "e-mail conversation" (an apparent reference to the statements by the two PeachBlossoms part-time employees) and the fact that "it's very wet in this area, and it's foreseeable and expected you are going to track the water on the dance floor." *Id.* at 66.[6]

---

[6] PeachBlossoms has not offered any expert testimony.

## II.  Fed. R. Civ. P. 56 Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex Corp.*, 477 U.S. at 322-24.  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 248.  In other words, "[f]actual disputes that are irrelevant . . . will not be counted."  *Id.*

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  The court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).  But, of import here, in

resolving a summary judgment motion the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainebleau Corp.*, 752 F.3d 350, 355 (4th Cir. 2014), *rehearing en banc granted* (July 1, 2014). Indeed, "'the very mission of the summary judgment procedure is to pierce the pleadings and *to assess the proof* in order to see whether there is a genuine issue for trial.'" *Id.* (quoting Advisory Committee's Notes to Fed. R. Civ. P. 56) (emphasis added in *Boyer-Liberto*). In supporting or opposing summary judgment, a party must rely on facts that would be admissible at trial. *Id.* at 9. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson*, 477 U.S. at 248. In contrast, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

### III.  Discussion

A.  Choice of Law

As a preliminary matter, I must address choice of law. A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md.

691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 625, 925 A.2d

636, 651 (2007); *Phillip Morris, Inc. v. Angeletti*, 358 Md. 689, 744, 752 A.2d 200, 230 (2000).

Because the alleged events took place in Maryland, the substantive tort law of Maryland governs

plaintiffs' negligence and loss of consortium claims.  *See Hauch v. Connor*, 295 Md. 120, 123-

24, 453 A.2d 1207, 1209 (1983).

B.  Negligence Claim

In its summary judgment motion, Sandaway argues that plaintiffs cannot recover for

negligence, due to a lack of evidence to support plaintiffs' theory of causation.  S. Mot. at 1.

Sandaway also contends that it lacked actual or constructive notice of the purportedly dangerous

conditions on the dance floor.  *Id.* at 1.  For its part, PeachBlossoms asserts that plaintiffs

"cannot establish [that] any act or failure to act by" PeachBlossoms was the proximate cause of

Ms. Rybas's fall and her resulting injuries.  P. Mot. at 2.  PeachBlossoms also maintains that

plaintiffs cannot prove that it breached any duty owed to them, *see id.* at 2, and argues, *inter alia*,

that even if plaintiffs could show the existence of a dangerous condition, PeachBlossoms lacked

actual or constructive knowledge of such a condition.  *See* P. Mem. at 17.

Plaintiffs challenge defendants' arguments, focusing in part on what they characterize as

"a dangerous condition created by bad weather," and assert that the condition was "foreseeable."

Opp. at 4.  They contend that defendants were negligent in that they failed "to take even the most

basic of safety precautions to safeguard the wedding guests," and argue that defendants "failed to

place a single sign warning of wet and/or slippery conditions, mats for guests to wipe their feet,

and their employees failed to warn the guests about the wet and slippery conditions."  *Id.* at 10.

In their view, defendants' conduct "proved to be a recipe for the disaster . . . ."  *Id.*

1. Proof of negligence

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *see Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986)) (alterations in *Schultz*).

"In 'slip and fall' cases, the duty of care owed by an owner or occupier of a premises is a function of his legal relationship to the person entering on the premises." *Garner v. Supervalu, Inc.*, 396 F. App'x 27, 29 (4th Cir. 2010). *See, e.g.*, *Casper v. Chas. F. Smith & Son, Inc.*, 316 Md. 573, 578, 560 A.2d 1130, 1133 (1989) (the duty of an owner or occupier of land "depends upon the status of the plaintiffs at the time of the accident"). Specifically, in Maryland, the duty that an owner or occupier of land owes to persons entering onto the land varies according to the visitor's status as an invitee (i.e. a business invitee), a licensee by invitation (i.e., a social guest), a bare licensee, or a trespasser. *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 44, 656 A.2d 307, 312 (1995); *Wagner v. Doehring*, 315 Md. 97, 101-02, 553 A.2d 684, 686 (1989); *Rowley v. Mayor of Baltimore*, 305 Md. 456, 464-65, 505 A.2d 494, 498 (1986). The highest duty is owed

to a business invitee, defined as "'one invited or permitted to enter another's property for purposes related to the landowner's business.'" *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 334, 859 A.2d 266, 273 (2004) (citations omitted). *Accord Casper v. Chas. F. Smith & Son, Inc.*, 71 Md. App. 445, 457, 526 A.2d 87, 92 (1987), *aff'd*, 316 Md. 573, 560 A.2d 1130 (1989); *see Lane*, 338 Md. at 44, 656 A.2d at 312; *Howard County Bd. of Educ. v. Cheyne*, 99 Md. App. 150, 155, 636 A.2d 22, 25 (1994), *cert. denied*, 335 Md. 81, 642 A.2d 192 (1994). Here, for purposes of summary judgment, neither defendant challenges plaintiffs' characterization that they were business invitees.[7]

An owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care. *Casper*, 316 Md. at 582, 560 A.2d at 1135; *see Lane*, 338 Md. at 44, 656 A.2d at 312 (stating owner owes "a duty of ordinary care to keep the property safe for the invitee."); *Evans v. Hot Shoppes, Inc.*, 223 Md. 235, 239, 164 A.2d 273, 276 (1960); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374 (1997); *Pahanish v. Western Trails, Inc.*, 69 Md. App. 342, 355, 517 A.2d 1122, 1128 (1986). The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers. *Tennant*, 115 Md. App. at 388, 693 A. 2d at 374.

In *Gillespie v. Ruby Tuesday, Inc.*, 861 F. Supp. 2d 637 (D. Md. 2012), Judge Blake of this Court explained: "The duty owed to an invitee is 'to use reasonable and ordinary care to

---

[7] However, PeachBlossoms reserves the right to later challenge plaintiffs' status as business invitees, should its summary judgment motion be denied. *See* P. Reply at 4 n.2.

keep [the] premises safe for the invitee and to protect [the invitee] from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for [the invitee's] own safety will not discover.'" *Id.* at 641 (quoting *Deboy v. City of Crisfield*, 167 Md. App. 548, 555, 893 A.2d 1189, 1193 (2006)) (modifications in *Deboy*).  *Accord Garner*, 396 F. App'x at 29; *Bramble v. Thompson*, 264 Md. 518, 521, 287 A.2d 265, 267 (1972); *see also Pahanish*, 69 Md. App. at 355, 517 A.2d at 1128 ("At common law, the landowner's duty to business invitees is to use reasonable and ordinary care to keep his premises in a safe condition and to protect invitees against the dangers of which the landowner is aware or which, with reasonable care, he could have discovered.").

Although the business invitor has a duty to protect against unreasonably dangerous conditions, the business invitor is not an insurer of the invitee's safety.  *Moulden v. Greenbelt Consumer Services, Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965); *Lexington Market Authority v. Zappala*, 233 Md. 444, 446, 197 A.2d 147, 148 (1964).  Like the owner, the invitee has a duty to exercise due care for his or her own safety.  This includes the duty to look and see what is around the invitee.  Accordingly, the owner or occupier of land ordinarily has no duty to warn an invitee of an open, obvious, and present danger.  *Casper*, 316 Md. at 582, 560 A.2d at 1135; *Tennant*, 115 Md. App. at 389, 693 A.2d at 374.

> [T]here is no liability for harm resulting from conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care. The mere existence of a defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it.

W. Page Keeton, *et. al.*, Prosser and Keeton on the Law of Torts, § 61, at 426 (5th ed. 1984).  *See also, e.g.*, *Rehn v. Westfield Am.*, 153 Md. App. 586, 593, 837 A.2d 981, 984 (2003)

("'[S]torekeepers are not insurers of their customers' safety, and no presumption of negligence arises merely because an injury was sustained on a storekeeper's premises.'") (quoting *Giant Food, Inc. v. Mitchell*, 334 Md. 633, 636, 640 A.2d 1134, 1135 (1994)), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004).

Regarding the burden of proof, "[i]n an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition or had actual or constructive knowledge of its existence." *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 119, 113 A.2d 405, 408 (1955); *see Garner*, 396 F. App'x at 29; *Maiga v. L.F. Jennings, Inc.*, 2010 WL 889670, at *3 (D. Md. Mar. 5, 2010); *Moulden*, 239 Md. at 233, 210 A.2d at 726; *Zappala*, 233 Md. at 446, 197 A.2d at 148; *Joseph v. Bozzuto Mgmt. Co.*, 173 Md. App. 305, 315-316, 918 A.2d 1230, 1235 (2007).

## 2. Causation

In Sandaway's view, no evidence exists to support "any particular theory of causation," and plaintiffs instead "expect this Court to submit this case to a jury based on the mere speculation that Mrs. Rybas fell on the dance floor due to some unidentified cause." S. Mem. at 5. Further, Sandaway maintains that plaintiffs have "failed to produce even a scintilla of evidence that mud, grass, rain or water on the dance floor was a cause of [Ms. Rybas's] fall." *Id.* Similarly, PeachBlossoms insists that it is "undisputed no one knows what caused Ms. Rybas to fall," P. Mem. at 9, and argues that because plaintiffs offer nothing more than speculation, summary judgment in its favor is warranted. *See id.* at 13.

The parties cite numerous cases in connection with their causation arguments. A number of them are particularly illustrative. Among the cases plaintiffs rely on is *Bass v. Hardee's Food Systems, Inc.*, 982 F. Supp. 1041 (D. Md. 1997), *aff'd*, 229 F.3d 1141 (Table), 2000 WL 1124515 (4th Cir. 2000) (unpublished per curiam opinion). In *Bass*, 982 F. Supp. at 1042, the plaintiff sued the owner of a Roy Rogers restaurant after suffering a slip-and-fall in the restaurant's parking lot. As the defendant noted, under Maryland law a plaintiff fails to meet his burden of proof "'if it appears that the injuries resulted from either defendant's negligence or some other cause, for the existence of which defendant[] is not responsible, unless the plaintiff excludes the independent cause as the proximate cause of the injuries.'" *Id.* at 1043 (quoting *Rawls*, 207 Md. at 119-20, 113 A.2d at 408). In that regard, the defendant emphasized that the plaintiff "did not know what he fell on"; that there were no eyewitnesses to the fall; and that even if, as alleged, the plaintiff had slipped on ice, it "might have come from cars recently entering the parking lot or [plaintiff's] own shoes . . . rather than a consequence of a breach of duty by [the defendant]." *Bass*, 982 F. Supp. at 1043.

Notwithstanding the defendant's contentions, the district court concluded that summary judgment was inappropriate given the "evidence in the record supporting the conclusion that [the plaintiff's] injury resulted from a breach of duty by defendant," which included evidence that both the plaintiff's wife and a Roy Rogers manager found ice in the area where plaintiff was found, as well as the plaintiff's testimony "that he did not move from the spot where he fell." *Id.* The district court also concluded that a reasonable jury could find that plaintiff had slipped on ice, given that the fall "occurred in January, a few days after a period of snowfall," and that expert testimony indicated that runoff water would have "pooled and froze[n] in the very area" in

which the plaintiff fell.  *Id.*  Moreover, "[t]he expert opined that the dangerous condition was predictable at the time of the accident, reasonable examination would have revealed the condition, and remedial steps would have cured the icy buildup." *Id.* at 1043-44.

Plaintiffs also point to *Konka v. Wal-Mart Stores, Inc.*, 133 F.3d 915 (Table), 1998 WL 24378, at *1 (4th Cir. 1998) (unpublished per curiam opinion), in which the plaintiff filed suit after falling at a Wal-Mart store.  Despite heavy rain, the doors to the store's lawn and garden department, which was located in a covered patio area outside the main store, had been left open. *Id.*; *see id.* at *4.  The plaintiff's husband observed that the lawn and garden department's tile floor was "shiny and wet," but the plaintiff did not, and she suffered a fall.  The plaintiff later stated that "her clothes got wet from being on the floor," and, after her fall, "an unidentified Wal-Mart employee came over to see if she was injured and allegedly told [the plaintiff] that the floor 'should have been mopped.'" *Id.*

The Fourth Circuit concluded that "sufficient evidence was presented for a jury to have reasonably concluded either that the wet spot was 'placed' there by Wal-Mart because rain water blew in through the open door, or that some employee did have a special duty to observe the area and watch for hazards." *Id.* at *4.  According to the *Konka* Court, a reasonable jury could have inferred, in light of evidence concerning heavy rain that day and the length of the overhang covering the patio, that "Wal-Mart's actions in leaving the door open during the rain. . . caused the wet condition on which [the plaintiff] slipped." *Id.*  Of relevance here, the Court also concluded, in the alternative, that a reasonable jury could have found that Wal-Mart was "on constructive notice of the wet and hazardous condition," given that two employees who were responsible for maintaining that area "were aware that it was raining heavily outside and that the

door to the patio was open." *Id.* In other words, because a reasonable jury could have found "that [Wal-Mart] either created the dangerous condition or had constructive knowledge of it," the Fourth Circuit affirmed the trial court's decision refusing to grant Wal-Mart's motions for judgment as a matter of law. *Id.*

For their part, defendants rely on several cases that, although favorable in certain respects, do not directly support their entitlement to summary judgment based on a failure to establish causation. *Myers v. TGI Friday's, Inc.*, 2007 WL 4097498 (D. Md. Nov. 9, 2007), is one such case.

In *Myers*, the plaintiff slipped on a tile floor while walking from a restaurant's bar area to the restroom, allegedly falling due to a "'wet, slippery and/or greasy substance located on the floor near the restroom and kitchen areas of'" the restaurant. *Id.* at *1 (citation omitted). Plaintiff was wearing "'heeled shoes'" and, in the three-hour period preceding her fall, she had consumed a "'large dinner,'" along with up to three drinks. *Id.* at *1 (citations omitted). Shortly after the fall, two restaurant managers examined the area where the incident occurred and did not find any wetness, though the managers provided conflicting testimony as to whether they actually touched the floor as part of that inspection. *Id.* at *2. The managers conceded that spills occasionally occur, and the restaurant required its employees to wear "'non slip shoes,'" in part because of such spills. *Id.* at *3.

The *Myers* Court found that the plaintiff "provide[d] little evidence supporting the existence of a dangerous condition." In particular, although the plaintiff testified that the floor "'felt slippery,'" she did not "allege that her clothes or any other part of her person was wet or greasy following the fall"; "concede[d] that she did not see what caused her to fall or see any

substance on the floor before or after she fell"; and identified no other witness who "claim[ed] that the floor where plaintiff fell was slippery" that evening. *Id.* at *6 (citation omitted).[8]  In the view of the *Myers* Court, the plaintiff "could just as well have slipped on the floor because of the heeled shoes she was wearing or from the effects of the almost three alcoholic drinks she had consumed." *Id.*  The *Myers* Court distinguished other cases in which "a dangerous condition unquestionably existed." *Id.*  Nevertheless, the *Myers* Court did not base its conclusion on the causation element.  Rather, it assumed, for purposes of summary judgment, that a dangerous condition had existed, and concluded that the plaintiff failed to present "sufficient evidence that defendant caused or had knowledge of the dangerous condition." *Id.* at 6-7.

Defendants also rely on *Ronk v. Corner Kick, Inc.*, 850 F. Supp. 369 (D. Md. 1994).  In *Ronk*, the plaintiff sued a sports facility and its owners, after slipping and falling on water that had accumulated on a racquet ball court. *Id.* at 369-70.  The *Ronk* Court concluded: "Where the presence of a foreign substance on a floor is explainable by causes beyond a proprietor's control as well as within it, it is impermissible for a trier of fact to conclude that the proprietor's cause was the cause-in-fact." *Id.* at 371.  Notably, the *Ronk* Court made this observation in the context of its analysis of whether the defendants had *created* the wet condition.  *See id.*  And, this conclusion did not end the court's analysis.  Instead, the court went on to consider whether the defendants had actual or constructive notice of the wet spot.  *See id.*  Accordingly, *Ronk* does not offer direct authority for defendants' position that the existence of other possible causes of Ms. Rybas's fall prevents a jury from deciding in plaintiffs' favor.

---

[8]  In a footnote, the *Myers* Court observed, 2007 WL 4097498, at *6 n.6 (citation omitted):  "Although plaintiff has retained the shoes she was wearing the night of the fall, she does not argue that they provide evidence of wetness or grease."

Another case pertinent to the causation issue is *Maans v. Giant of Maryland, L.L.C.*, 161 Md. App. 620, 623, 871 A.2d 627, 629, *cert. denied*, 388 Md. 98, 879 A.2d 43 (2005), in which the plaintiff, who was pregnant, suffered a fall near the checkout lines at a Giant grocery store. The plaintiff "did not see anything on the floor either before or after her fall" and "never felt water, nor did she sense that her clothes were wet." *Id.* at 624; 871 A.2d at 629. An assistant manager testified that she discovered several drops of Citra, a clear soda, on the ground, which she traced to the shopping cart of another customer in a nearby checkout line. *Id.*, 871 A.2d at 629. Nevertheless, with respect to the issue of causation, the Maryland Court of Special Appeals found that the plaintiff offered sufficient evidence for a jury to conclude that she slipped on water rather than on droplets of Citra soda. *Id.* at 629; 871 A.2d at 632. The *Maans* Court said: "Evidence that the assistant manager, immediately after Maans's fall, directed a person with towels in his hand 'to clean up all the water' was sufficient evidence, standing alone, to allow a fact-finder to infer that Maans slipped on water, not on Citra soda." *Id.* at 629-30, 871 A.2d at 632. In other words, despite the existence of an alternate explanation for the plaintiff's fall, the appellate court found that, in light of the evidence presented, a fact-finder was entitled to find that one cause, rather than the alternative that the defendant had identified, was the reason for the plaintiff's slip and fall. *Id.*[9]

In support of Sandaway's claim that plaintiffs' causation evidence is legally insufficient, Sandaway asserts that plaintiffs had originally advanced a theory that Ms. Rybas's shoe caught on a raised "lip" at the edge of the dance floor. S. Reply at 5 (citing Complaint). Indeed, in the

---

[9] Notably, however, the *Maans* Court went on to conclude that the plaintiff failed to offer sufficient "time on the floor" evidence, and thus affirmed the trial court's entry of judgment in the defendant's favor. *See* 161 Md. App. at 639-40; 871 A.2d at 638-39.

Complaint plaintiffs alleged that, while Ms. Rybas was dancing, "the heel of her shoe caught on the lip of the portable dance floor . . . ." *See* Complaint ¶ 11. However, plaintiffs also maintained that the wedding tent "had been pitched on a grassy area that was soggy and muddy because of rain." *Id.* ¶ 9. Further, the Complaint asserted that the wedding guests, including Ms. Rybas, "were led across the grass and mud and into the tent," which contained a dance floor "that was erected over very soft ground by" PeachBlossoms. *See id.* ¶ 10. As such, the Complaint contains multiple allegations relevant to the theory that plaintiffs are pursuing at this stage, focusing not on any defect with the dance floor itself but rather upon the wet conditions. Although the possibility that Ms. Rybas tripped on the edge of the dance floor could undermine the persuasiveness of plaintiffs' theory in the eyes of a jury, it is not apparent that plaintiffs have wholly transformed their theory of liability in the manner defendants suggest.

In this case, the evidence from which a jury could conclude that that wet, slippery conditions existed on the dance floor and caused Ms. Rybas's fall is far from overwhelming. Plaintiffs' proof is based in large part on testimony from one witness, Mr. Shea. He stated that, after heavy rain began near the start of the dinner service, the dance floor became "wet because of people walking" on it. Shea Dep. at 24-25. Mr. Shea also observed "[m]ud, rain and mud, [and] a little grass" on the dance floor, near where Ms. Rybas had fallen. *Id.* at 45. For his part, Mr. Balajewski did not know the reason for his wife's fall, but he observed that it was slippery close to where she had fallen. And, among other things, Ms. Rybas testified that her "foot slipped" while she was dancing. Moreover, various evidence exists regarding the rainy conditions and wet grass on the day of the wedding, and it is uncontested that wedding guests had to cross wet, grassy areas in order to access a restroom at Sandaway and the wedding tent

itself.  At this stage, the evidence must be viewed in the light most favorable to plaintiffs.  I am not persuaded that summary judgment in defendants' favor is warranted based on a lack of evidence of causation.

To be sure, a reasonable jury may well conclude that Ms. Rybas's fall was not caused by water and/or grass on the floor, but instead resulted from her "vigorous" dancing in heeled shoes.  Notably, Ms. Rybas herself conceded that she was "[n]ot exactly" sure what caused her fall.  Rybas Dep. at 39.  Nevertheless, it is the province of the fact-finder to resolve genuine disputes as to causation.  *See, e.g.*, *Frostbutter v. Bob Evans Farms, Inc.*, 2013 WL 4026985, at *7 (D. Md. Aug. 6, 2013) ("Plaintiff has introduced a theory of causation and supported it with some specific facts.  Therefore, summary judgment will not be granted on the grounds that Plaintiff's causation evidence is purely speculative.").

### 3.  Creation or notice of dangerous conditions

As noted, to prevail, plaintiffs must prove either that defendants created the dangerous conditions that caused Ms. Rybas's fall, or that defendants had actual or constructive notice of those conditions.  Here, plaintiffs do not appear to pursue a theory that defendants directly created the dangerous conditions.  Indeed, plaintiffs begin their Opposition with a rhetorical question, asking whether defendants should "be able to escape liability for damages caused by a dangerous condition—*created by bad weather*—that they had actual or constructive notice of?"  Opp. at 4 (emphasis added).  And, as their arguments make clear, their theory is based on the notion that the dance floor was made wet by wedding guests tracking water, mud, or grass onto it.  As such, the viability of plaintiffs' negligence claim turns on whether they can establish that defendants and actual or constructive knowledge of the danger.

a.  Actual knowledge

Plaintiffs insist: "Defendants had actual knowledge of the dangerous condition that caused Plaintiff Rybas's injuries for a number of reasons."  Opp. at 26.  In this regard, plaintiffs note that defendants knew of both the rain that preceded the wedding and the weather conditions on October 4, 2010; that defendants knew the dance floor would be slippery when wet; that witnesses, including PeachBlossoms employees, stated that the dance floor was wet on the night of the wedding; and that the mother of the bride fell on the dance floor prior to Ms. Rybas's fall. *Id.* at 26-27; *see also id.* at 37-38.

In my view, none of the evidence cited, even when viewed in the light most favorable to plaintiffs, establishes that defendants had actual knowledge of dangerous, wet conditions on the dance floor at the time of Ms. Rybas's fall.

For one, plaintiffs rely on several statements by employees of PeachBlossoms, but none establish actual knowledge of wet conditions on the dance floor at or before the time of Ms. Rybas's fall.[10]  Even if properly subject to this Court's consideration, *see supra* footnote 5, the statements concerning wet conditions made by two part-time PeachBlossoms employees, more than two years after the incident, plainly do not establish actual knowledge on the part of defendants prior to Ms. Rybas's fall.  *See Groat v. Wal-Mart Stores, Inc.*, 2010 WL 5391515, at *10 (D. Md. Dec. 20, 2010) (noting absence of "any statement by a Wal-Mart employee indicating the store was aware of the dangerous condition *before* Mrs. Groat slipped and fell"); *see also Burwell v. Easton Mem. Hosp.*, 83 Md. App. 684, 690, 577 A.2d 394, 397 (1990) (nurse's statement that "'[s]omeone should have cleaned it up'" did not permit reasonable

---

[10] Of course, statements by PeachBlossoms' employees could establish actual knowledge on the part of PeachBlossoms but not necessarily on the part of both defendants.

inference that hospital had actual or constructive knowledge of salad on stairs before plaintiff fell) (modification in original).   Moreover, plaintiffs offer no evidence that contradicts the statements of Laurie Dennis, Gregory Dennis, Allison Dungan, and Susan Galanek, all of PeachBlossoms, which indicate that they lacked actual knowledge of dangerous conditions on the dance floor prior to Ms. Rybas's fall.  *See* L. Dennis Aff.; G. Dennis Aff.; A. Dungan Aff.; S. Galanek Aff.  And, Laurie Dennis's admission that "by 10:00, 11:00, 12:00 o'clock the dance floor was probably a mess" does nothing to establish actual knowledge earlier in the evening. *See* L. Dennis Dep. at 56-57.

Plaintiffs also point to deposition testimony from Ms. Rybas.  When Ms. Rybas was asked whether she had seen anyone else slip, she stated that at some point prior to her own fall she saw the mother of the bride "slip and fall while she [i.e., the bride's mother] was on the dance floor."  Rybas Dep. at 100.  However, the record is essentially devoid of information regarding the circumstances surrounding that fall.  *See, e.g.*, *Smith v. Hercules Co.*, 204 Md. 379, 385, 104 A.2d 590, 593-94 (1954) ("Evidence of other accidents, particularly where the circumstances are not identical, [has] little probative value and [is] calculated to prejudice the jury.").  In particular, the record does not include an affidavit or deposition testimony from the bride's mother regarding the circumstances of her fall.  Nor have plaintiffs identified any witness other than Ms. Rybas who saw the mother of the bride fall.  *See also* S. Reply at 7 n.14 (noting that two of the bride's sisters did not observe their mother's fall).

Further, even where a defendant has actual knowledge of weather conditions, such knowledge is a far cry from actual knowledge of wetness on the dance floor prior to Ms. Rybas's fall.  Accordingly, plaintiffs fall well short of showing any genuine dispute of material fact as to

whether defendants possessed actual knowledge of the dangerous condition that they maintain caused Ms. Rybas's fall.

### b.  Constructive knowledge

In the alternative, plaintiffs argue: "Even assuming Defendants did not have actual knowledge of the dangerous condition . . . the facts demonstrate that both Defendants had constructive knowledge of the dangerous condition that injured Plaintiff Rybas."  Opp. at 28; *see also* Opp. at 38.

"Constructive knowledge" has been defined by the Maryland Court of Appeals as follows:

> [T]he customer cannot recover unless it appears that the storekeeper could have discovered the condition by the exercise of ordinary care so that, if it is shown that the condition existed for a length of time sufficient to permit a person under a duty to discover it if he had exercised ordinary care, his failure to discover it may in itself be evidence of negligence sufficient to charge him with knowledge of it.

*Rawls v. Hochschild, Kohn & Co.*, *supra*, 207 Md. at 120, 113 A.2d at 409.  *Accord Alford v. Food Lion, LLC*, 2013 WL 5940130, at *2 (D. Md. Nov. 4, 2013); *Black v. Kmart Corp.*, 2010 WL 2292217, at *2 (D. Md. June 4, 2010); *Burwell*, 83 Md. App. at 688, 577 A.2d at 395.

According to plaintiffs, a variety of evidence establishes defendants' constructive knowledge of the wet dance floor that, in their view, caused the injury to Ms. Rybas.  In particular, plaintiffs cite defendants' knowledge of inclement weather; that the grounds were wet on the day of the wedding; that the dance floor would be slippery when wet; and that guests would have to walk across wet grass in order to access the dance floor, as well as witness testimony indicating that the dance floor was, in fact, wet on the night of the wedding.  *See* Opp. at 29.

The parties sharply disagree as to whether "time on the floor" evidence is necessary in this case and, if it is, whether sufficient evidence exists in the record.  As indicated, to show that a defendant had constructive notice of a hazardous condition, the evidence must be sufficient to "allow a reasonable juror to conclude that" the substance on which a plaintiff slipped and fell "was present long enough for [the defendant], using reasonable care, to have discovered it." *Alford*, 2013 WL 5940130, at *2.  *See also, e.g.*, *Yates v. Wal-Mart Stores, Inc.*, 2004 WL 1083250, at *2 (D. Md. May 11, 2004) ("[C]ourts have been reluctant to conclude that the store owner had notice where it is unclear how long the condition existed and the hazardous condition could have been created by a customer."); *Deering Woods Condo. Ass'n v. Spoon*, 377 Md. 250, 264, 833 A.2d 17, 24-25 (2003) ("'It is not necessary that there be proof that the inviter had actual knowledge of the conditions creating the peril; it is enough if it appear[s] that it could have discovered them by the exercise of ordinary care, so that, if it is shown that the conditions have existed for a time sufficient to permit one, under a duty to know of them, to discover them, had he exercised reasonable care, his failure to discover them may in itself be evidence of negligence sufficient to charge him with knowledge of them.'") (citation omitted); *Joseph*, 173 Md. App. at 316, 918 A.2d at 1236 ("In terms of constructive knowledge, . . . it is necessary for the plaintiff to show how long the dangerous condition has existed.").

In *Maans v. Giant of Maryland, LLC*, *supra*, 161 Md. App. at 639-40, 871 A.2d at 638, the Maryland Court of Special Appeals identified two purposes underlying Maryland's requirement of "time on the floor" evidence:

> (1) [I]t requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the

floor.  Thus, proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

*Accord Oliver v. Maxway Stores*, 2013 WL 6091844, at *4 (D. Md. Nov. 18, 2013).   Further, evidence regarding "the size or nature of the spill is not a substitute for 'time on the floor' evidence."  *Saunders v. Wal-Mart Stores, Inc.*, 2010 WL 1416542, at *4 (D. Md. Apr. 5, 2010).

Regarding "time on the floor" evidence, plaintiffs assert:  "The 'time of the floor' theory does not apply, when the business proprietor has knowledge of the actual hazard."  Opp. at 41.  To the extent plaintiffs are merely reframing their argument that defendants had actual knowledge of wet, slippery conditions on the dance floor at the time of Ms. Rybas's fall, they fail to provide sufficient evidence to establish as much.  *See supra.*

In any event, plaintiffs also argue: "Even assuming [that] this Court applies the time on the floor theory, as set forth in *Zappala* and *Ma[a]ns*, the Defendants should have known or became aware of the hazards on the dance floor before the Plaintiff fell."  Opp. at 42.  To that end, plaintiffs insist that, when "viewing the evidence in the light most favorable to [plaintiffs], a jury could find that the dangerous condition was present on the dance floor for several hours."  Opp. at 42.  *See also id.* at 24 ("the facts show that since the guests had been tracking mud, water, and debris across the dance floor as early at 5:15 and Plaintiff Rybas fell at approximately 7:55, the dangerous condition – the slippery floor – existed for approximately one hour and forty minutes") and 29 (asserting that the evidence shows that the conditions that caused the dance floor to become wet "were present for up to an hour and forty-five minutes during the time period that Plaintiff Rybas was injured").

Of relevance to the parties' dispute over "time on the floor" evidence in the context of this case, plaintiffs seek to draw a distinction between what they perceive as two separate

categories of slip-and-fall accidents: (1) those involving a "spilled substance," in which the danger "arise[s] instantaneously"; and those involving (2) "bad weather."  *See* Opp. at 26; *see also id.* at 4, 38, 40-41.  Plaintiffs maintain that in this case, which in their view falls in the latter category, defendants "had actual and/or constructive knowledge of the hazardous conditions and foreseeable danger well in advance of the fall."  *See* Opp. at 40-41.

To some degree, plaintiffs exaggerate what they portray as a clear distinction between "spilled substance" cases, and other cases that involve, for example, inclement weather. Inclement weather does not guarantee that a dangerous condition will result.  As a result, the particular circumstances are relevant.  Specifically, whether sufficient time existed for a landowner to discover, cure, or clean up a dangerous condition depends upon the "'nature of the danger, the number of persons likely to be affected by it, the diligence required to discover or prevent it, opportunities and means of knowledge, the foresight which a person of ordinary care and prudence would be expected to exercise under the circumstances, and the foreseeable consequences of the conditions.'"  *Deering Woods Condo. Ass'n*, 377 Md. at 264, 833 A.2d at 24-25 (citation omitted).  *See Maiga v. L.F. Jennings, Inc.*, *supra*, 2010 WL 889670, at *3; *Rehn v. Westfield America*, *supra*, 153 Md. App. at 593, 837 A.2d at 984-85.

At the same time, defendants rely in part on cases that involve markedly different facts, where the particular hazard and the timing of its appearance were far from foreseeable.  For instance, in *Lexington Market Authority v. Zappala*, *supra*, 233 Md. at 445, 197 A.2d at 148, the plaintiff slipped and fell "on a spot of oil or grease in a self-service parking garage."  The Maryland Court of Appeals concluded that the defendant lacked notice of the spill, explaining: "For all we know, the oil or grease may have leaked from a car occupying the space beside her

car, only a few moments before she returned. . . . It may well be that a garage keeper should anticipate that oil or grease may occasionally leak from parked cars, but he is not an insurer and we think it would be unreasonable to hold that it is his duty to continuously inspect and sand down any and all leakage as soon as it occurs, even if we assume that periodic inspections are necessary." *Id.* at 446, 197 A.2d at 148. *See also, e.g.*, *Maans*, 161 Md. App. at 639-40; 871 A.2d at 638-39 (affirming judgment for defendant grocery store where plaintiff failed to establish that store was on notice of spilled water, of unknown origin and which was on the floor for an unknown amount of time).

In my view, the facts presented here bear some resemblance to those in cases involving slip-and-fall incidents on ice, including *Bass v. Hardee's Food Systems, Inc.*, discussed above, and *Honolulu Ltd. v. Cain*, 244 Md. 590, 224 A.2d 433 (1966). In *Honolulu Ltd.*, 244 Md. at 598, 224 A.2d at 437, the Maryland Court of Appeals rejected the defendant's argument that "the dangerous condition did not exist for a sufficient length of time," explaining:

> Although the ice on which [the plaintiff] slipped formed only 15 or 20 minutes before the accident, the defendant had knowledge that water would flow from melting snow across the lot. It knew also that it was likely on February evenings the water was apt to freeze. In these circumstances, it is immaterial that the ice formed only a short time before the plaintiff fell on it. The jury could have found that reasonable care demanded that the wet area be salted, as a precaution, before the ice had formed.

Similarly, *Bass*, 982 F. Supp. at 1042, involved a slip-and-fall in an icy parking lot. In an unpublished opinion affirming the district court, the Fourth Circuit rejected the defendant's argument that the plaintiff failed to show that ice was on the ground for a sufficient amount of time to be discovered. *Bass*, 2000 WL 1124515, at *4 n.4. The Fourth Circuit, citing *Honolulu*

*Ltd.*, concluded that "the length of time that the ice was actually on the ground is immaterial to [the plaintiff's] claim." *Id.*

Likewise, in *Gast, Inc. v. Kitchner*, 247 Md. 677, 681, 234 A.2d 127, 129 (1967), a defendant asserted that it lacked constructive notice of icy conditions because "the freezing could have only occurred just prior to the accident . . . ."  The Maryland Court of Appeals, citing *Honolulu Ltd.*, rejected that contention, explaining that "the jury could properly find that the property owner, knowing of the drainage pattern directly affecting the pathway, permitted a dangerous condition to exist and therefore failed to use the degree of care incumbent upon one who opens his premises to the general public." *Id.*, 234 A.2d at 129.  Additionally, the *Gast* Court said, *id.* at 685, 234 A.2d at 131:

> It is obvious in this case that the appellant had actual notice of the drainage condition it had created on the premises and certainly there was evidence from which the jury could have found that it should have reasonably anticipated the formation of ice on the pathway as a result of that condition.  The appellant knew of the location of the downspout directly over the pathway which route he had selected, he knew that five inches of snow had fallen the previous day and he is chargeable with the knowledge that the downspout would be carrying off water from the melting snow, discharging it directly onto the pathway he had cleared. He is also chargeable with the knowledge that during the month of January it is not uncommon for water to freeze at night.

Further, the Maryland Court of Appeals echoed the conclusion of the *Honolulu Ltd.* Court that it was "'immaterial that the ice formed only a short time before the plaintiff fell on it . . . .'" *Id.* at 686, 234 A.2d at 132 (quoting *Honolulu Ltd.*, 244 Md. at 598, 224 A.2d at 437).

In other words, courts have downplayed the significance of time-on-the-floor evidence under certain circumstances, in which defendants were aware of specific conditions, influenced by weather, that led to the emergence of a particular hazard.  Although *Honolulu Ltd.*, *Bass*, and *Gast* involved slip-and-fall incidents on ice, the reasoning of those cases is informative in the

context presented here, where defendants were aware of weather conditions and other factors that led to the alleged wet and slippery dance floor, including the layout of the property and the need to walk across the grass to access the tent and to use the restrooms.

Given the circumstances in this case, and viewing, as I must, the evidence in the light most favorable to plaintiffs, I cannot conclude, as a matter of law, that plaintiffs' negligence claim fails due to insufficient "time on the floor" evidence.  Here, there is no dispute that grass outside the tent was wet on the day of the wedding; that the owner's manual for the dance floor warned that it would be slippery when wet; that heavy rain began near the start of the dinner service, scheduled for 7:15 p.m.; that plaintiffs did not begin dancing until after completing their dinners; and that Ms. Rybas apparently did not fall until shortly before 8:00 p.m.  Moreover, as indicated, ample evidence exists establishing actual knowledge on the part of *both* defendants regarding the rainy conditions, the wet grass, and the fact that wedding attendees would be crossing wet grass near the tent.  Indeed, two days before the wedding, defendants discussed relocating the ceremony to higher ground due to the anticipated weather, but ultimately chose not to.  Further, this is not an instance in which the danger plaintiffs identify—a wet dance floor due to water, mud, or grass tracked onto it by wedding guests—plainly could have arisen despite defendants' best efforts.  *Cf. Maans*, 161 Md. App. at 640, 871 A.2d at 639 ("[T]he storekeeper would be potentially liable even though there is no way of telling whether there was anything Giant could have done that would have avoided the injury.").  In my view, the evidence on which plaintiffs rely passes muster, so as to allow a reasonable jury to conclude that defendants had constructive knowledge of the dangerous condition that plaintiffs maintain was the cause of Ms. Rybas's fall.

In short, when taking the evidence in the light most favorable to plaintiffs, granting summary judgment to defendants would be improper.   Therefore, defendants' summary judgment motions will be denied as to the negligence claim.

C.  Loss of Consortium

Defendants' arguments concerning plaintiffs' loss of consortium claim are wholly dependent on the viability of plaintiffs' negligence claim.   If plaintiffs cannot recover for negligence, Sandaway insists, they cannot recover on their loss of consortium claim.  S. Mot. at 2.  Like Sandaway, PeachBlossoms argues that if summary judgment is granted in its favor as to plaintiffs' negligence claim, then it is entitled to summary judgment as to the loss of consortium claim as well.   P. Mem. at 2 n.1.   In light of my conclusion that defendants are not entitled to summary judgment as to the negligence claim, summary judgment must be denied as to the loss of consortium claim.

## IV.  Conclusion

For the foregoing reasons, I will deny both summary judgment motions.   A separate Order follows.

Date: August 27, 2014                           _____/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge